## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ISHMAEL A. BURK, JR.,    :
  *Plaintiff*,     :
          :
 v.        :  CIVIL ACTION NO. 26-CV-2329
          :
MICHAEL JOHN ROMESBURG, *et al.*, :
  *Defendants*.    :

### MEMORANDUM

**Pappert, J.**                **April 15, 2026**

Ishmael A. Burk, Jr. filed this civil action asserting claims against Officer Michael John Romesburg, Cpl. Ryan Bunda, James C. Donnelly, and Chad Vargo, all of whom are police officials in Warminster Township, Pennsylvania.  Burk also seeks leave to proceed *in forma pauperis*.  For the following reasons, the Court will permit Burk to proceed without payment of the filing fee and dismiss the Complaint with leave to amend.

I[1]

Burk's allegations are brief.  He asserts that on March 5, 2026, he was stopped by Romesburg and states in conclusory terms that he was harassed.  (Compl. at 3.) More specifically, he alleges that he was "called the (N) word" by Romesburg and three unknown officers who were also on the scene.  (*Id.*. at 3, 5.)  These officers allegedly followed him on the way to a store and they "kept asking why I was in Warminster" stating, "that they don't like black people in their county."  (*Id.* at 3.)  He adds that he

---

[1] The factual allegations are taken from Burk's Complaint ("Compl.")  consisting of the form available to unrepresented litigants and attached handwritten pages.  (Dkt. No. 2.)  The Court deems the entire submission to constitute the Complaint and adopts the pagination supplied by the CM/ECF docketing system.  Where the Court quotes from the Complaint, spelling, grammar, and punctuation will be cleaned up as needed.

"was asked multiple times" why he was in Warminster "and called the N word multiple times." (*Id.* at 4.)  He was told "by the other officers" that "Black does not belong in Warminster." (*Id.*)  He provided his license and registration to the officers. (*Id.*)  Bunda tried to "rearrest" him after letting him go without providing any reason why he was putting Burk in handcuffs. (*Id.* at 4, 5.)  When Burk asked why this was happening, Bunda responded it was because he was black. (*Id.* at 4.)  Burk was "almost put in the back of [Bunda's] car for no reason." (*Id.*)  Vargo "was on the scene and made remarks on how [Burk] should not be in Warminster because [he is] Black and should not be in his city." (*Id.*)  Burk claims that Donnelly "did not provide the proper training for his officers on how to avoid these situations." (*Id.* at 5.)  Burk seeks money damages. (*Id.* at 6.)

A review of public records indicates that Burk was cited for the summary offense of driving while his operating privileges were suspended or revoked in Warminster. *Commonwealth v. Burk*, MJ-07109-TR-0000500-2026 (MJ Bucks).  He pled guilty to the charge on March 31, 2026.

II

The Court grants Burk leave to proceed *in forma pauperis*.  Accordingly, 28 U.S.C. § 1915(e)(2)(B)(ii) requires the Court to dismiss the Complaint if it fails to state a claim.  Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted); *see also Talley v. Wetzel*, 15 F.4th 275, 286 n.7 (3d Cir. 2021).  Although this "plausibility standard is not akin to a 'probability requirement,'" it demands "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 566 (2007)).  At this early stage of the litigation, the Court will accept the facts alleged in the *pro se* Complaint as true, draw all reasonable inferences in Burk's favor, and ask only whether the Complaint contains facts sufficient to state a plausible claim.  *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024) (3d Cir. 2024).  Conclusory allegations do not suffice.  *Iqbal*, 556 U.S. at 678.

The Court construes *pro se* allegations liberally.  *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021).  However, "pro se litigants still must allege sufficient facts in their complaints to support a claim."  *Id.* (quoting *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).  An unrepresented litigant "cannot flout procedural rules — they must abide by the same rules that apply to all other litigants."  *Id.*; *see also Doe v. Allegheny Cnty. Hous. Auth.*, No. 23-1105, 2024 WL 379959, at *3 (3d Cir. Feb. 1, 2024) (*per curiam*) ("While a court must liberally construe the allegations and 'apply the applicable law, irrespective of whether the pro se litigant mentioned it b[y] name,' *Higgins v. Beyer*, 293 F.3d 683, 688 (3d Cir. 2002), this does not require the court to act as an advocate to identify any possible claim that the facts alleged could potentially support.").

III

Burk appears to assert civil rights claims pursuant to 42 U.S.C. § 1983, the vehicle by which such claims can be brought in federal court. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see also Groman v. Township of Manalapan*, 47 F .3d 628, 638 (3d Cir. 1995) ("The color of state law element is a threshold issue; there is no liability under § 1983 for those not acting under color of law."). "A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). While unclear, the Court understands Burk to assert either a Fourth Amendment claim based on the traffic stop, an equal protection violation based on the use of racial epithets, or both. *See Vogt*, 8 F.4th at 185 (stating that the Court should "apply the relevant legal principle even when the complaint has failed to name it." (citing *Mala*, 704 at 244-45). He also appears to allege a claim against Donnelly for failing to train the other defendants.

A

Burk asserts that he "was stopped by" Romesburg, along with Bunda and other unknown officers, after they followed him to a store, and they harassed and used racial epithets during the stop. (Compl. at 3-4.) Once the stop commenced, Bunda tried to "rearrest" him after initially letting him go, handcuffed him, and "almost" put him in a police vehicle, without providing any reason why he was doing so. (*Id*. at 4.) While Burk states that he was handcuffed, it appears he was not actually arrested or

"rearrested" and was eventually permitted to leave the scene since he does not allege he was actually detained in the police vehicle or otherwise.  The public docket indicates he was cited for the traffic offense only.  *See Burk*, MJ-07109-TR-0000500-2026.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  It is well-settled that the temporary detention of an individual during a traffic stop is a "seizure" of "persons" under the Fourth Amendment.  *Whren v. United States*, 517 U.S. 806, 809-10 (1996).  Where police have directly witnessed a traffic violation, a traffic stop is a reasonable seizure under the Fourth Amendment. *See United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997) ("[A] traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations."); *see also Kansas v. Glover*, 589 U.S. 376, 386 (2020) (traffic stop was lawful where "[u]nder the totality of the circumstances of this case, Deputy Mehrer drew an entirely reasonable inference that Glover was driving while his license was revoked").

Where the stop is justified, the "seizure for a traffic violation justifies a police investigation of that violation."  *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' — to address the traffic violation that warranted the stop, and attend to related safety concerns."  *Id.* (internal citations omitted).  "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Id.* at 355; *see also* 75 Pa. Cons. Stat. § 6308(b) (providing that

when an officer has "reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title"). "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 575 U.S. at 355.

Two additional factors apply to the legality of a traffic stop. First, the length of any additional investigation and detention after a traffic stop must be supported by reasonable suspicion based on the facts and circumstances confronting the officer. *United States v. Hurtt*, 31 F.4th 152, 159 (3d Cir. 2022). Second, police are justified in ordering a driver out of the car "for their own protection during the brief detention required for that investigation." *United States v. Hackett*, 173 F. App'x 164, 165 (3d Cir. 2006) (citing *Moorefield*, 111 F.3d at 13-14).

Any Fourth Amendment claim Burk seeks to assert against Romesburg and Bunda based on the stop is undeveloped and cannot proceed as pleaded. He fails to provide any context for why Romesburg conducted the traffic stop, state the duration of the stop, or provide other details to determine whether or not the stop was reasonable, particularly where public records indicate that Burk plead guilty to the charged offense. Burk will be permitted an opportunity to file an amended complaint to provide additional facts if he is able to do so concerning these factors.

6

B

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  To state a plausible equal protection violation, a plaintiff must show that he received different treatment than other similarly situated individuals and that the disparate treatment was based on his or her protected class status.  *Leibert v. Phila. Hous. Auth.*, 474 F. App'x 76, 79 (3d Cir.2012) (citing *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir.2005)).  "Persons are 'similarly situated' for purposes of an equal protection claim when 'they are alike in all relevant aspects.'"  *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008) (emphasis omitted).  Additionally, to state a race-based equal protection claim, a plaintiff must allege that defendants were motivated by racial animus.  *See e.g., W.B. v. Matula*, 67 F.3d 484, 503 (3d Cir. 1995) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *Pratt v. Thornburgh*, 807 F.2d 355, 357 (3d Cir. 1986)).

Burk's allegation that the defendants made verbal racist remarks during the traffic stop does not alone state a § 1983 claim because verbal threats or taunts, without more, are insufficient to violate the Constitution.  *Burkholder v. Newton*, 116 F. App'x 358, 360 (3d Cir. 2004) (stating it is well settled that racially discriminatory statements, racial slurs, and racial epithets, on their own, fail to establish liability under § 1983); *see also DeWalt v. Carter*, 224 F.3d 607, at 612 (7th Cir. 2000) ("The use of racially derogatory language, while unprofessional and deplorable, does not violate

7

the Constitution"); *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999) ("an officer's use of a racial epithet, without harassment or some other conduct that deprives the victim of established rights, does not amount to an equal protection violation"); *Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997) (verbal abuse directed at religious and ethnic background does not state a cognizable constitutional violation); *Abuhouran v. Acker*, No. 04-2265, 2007 WL 603045, at *4 (E.D. Pa. Feb. 22, 2007) ("Although derogatory language in reference to plaintiff's race or ethnicity is strong evidence that the conduct in question is racially or ethnically motivated, it alone cannot support an equal protection claim.").

Rather, to be actionable as an equal protection claim the use of racial epithets must involve "harassment or some other conduct that deprives the victim of established rights." *Williams*, 180 F.3d at 706.  Burk again, however, fails to allege facts which could indicate whether a defendant's use of racial epithets constituted harassment or deprived him of his established rights considering that he does not contend he was unreasonably detained or arrested during the traffic stop.  Moreover, his assertion that he was told "by the other officers" that "Black does not belong in Warminster" (Compl. at 4), is a "collective" assertion where multiple individuals are named as defendants and is not a proper way to plead the personal involvement of each of the individuals. *See Lawal v. McDonald*, 546 F. App' x 107, 113 (3d Cir. 2014) (agreeing with the district court that the repeated and collective use of the word "Defendants" "fail[ed] to name which specific Defendant engaged in the specific conduct alleged").

The only specific defendants Burk identifies as using racially tinged language are Romesburg, Bunda and Vargo.  Romesburg allegedly used the "N word" while

8

making the traffic stop, Bunda allegedly told Burk that he was treated in the manner he describes because he was black, and Vargo said he should not be in Warminster because he is black.  (Compl. at 3, 4.)  But Romesburg is not alleged to have done anything else; Bunda did not arrest, "rearrest," or place Burk in a police vehicle during the stop; and Vargo's statement is insufficient in itself to establish racial harassment since it is the only thing he is alleged to have done during the incident.

C

Finally, Burk claims that Donnelly "did not provide the proper training for his officers on how to avoid these situations." (Compl at 5.)  Burk does not allege Donnelly had any responsibility to train others or that he was personally involved in the incident that Burk describes.  Assuming that Donnelly holds a supervisory position,[2] under § 1983 "a supervisor may be liable for [his or her] failure to train or supervise employees. . . ." *Whitfield v. City of Philadelphia*, 587 F. Supp. 2d 657, 666 (E.D. Pa. 2008).  A claim for supervisory liability or liability based upon a failure to train involves four elements:  (1) that an existing policy created an unreasonable risk of constitutional injury; (2) the supervisor was aware of this unreasonable risk; (3) the supervisor was

---

[2] "Suits against high-level government officials must satisfy the general requirements for supervisory liability." *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017).  There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015).  First, a supervisor may be liable if he or she "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)).  "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 227 (3d Cir. 2015).

9

indifferent to the risk; and (4) the injury resulted from the policy or practice. *See Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989). Where a need for "more or different training . . . is so obvious, and the inadequacy so likely to result in constitutional violations, that the failure to train . . . can fairly be said to represent official policy," *City of Canton v. Ohio*, 489 U.S. 378, 390 (1989), and that failure to train "actually causes injury," a supervisor may be held liable. Because Burk does not allege that Donnelly was personally involved in the incident, or that any policy violated his rights, this claim is also dismissed.

Burk will be allowed to file an amended complaint if he is able to allege additional facts to cure the defects the Court has identified in his claims. An order providing additional information on amendment will be entered separately.

**BY THE COURT:**

*/s/ Gerald J. Pappert*
**Gerald J. Pappert, J.**